UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-21014-CIV-ROSENBAUM/SELTZER

TOPP PAPER COMPANY, LLC,

        Plaintiff,

v.

ETI CONVERTING EQUIPMENT,

        Defendant.
_____/

ORDER ON DEFENDANT'S MOTION IN LIMINE
REGARDING PLAINTIFF'S CONSEQUENTIAL DAMAGES CLAIM

This matter is before the Court on Defendant ETI Converting Equipment's Motion *in Limine* Regarding Plaintiff's Consequential Damages Claim [D.E. 65]. The Court has reviewed Defendant's Motion, all supporting and opposing filings, and the record and is fully advised in the premises. For the reasons set forth below, the Court now grants in part and denies in part Defendant's Motion *in Limine*.

*I. Background*

This case arises from a dispute over two sophisticated pieces of equipment used for producing labeling products, known as the rETIflex slitting and rewinding machine and the Cohesio printing machine, which Defendant ETI Converting Equipment sold to Plaintiff Topp Paper Company, LLC. Over an extended period, Topp reported to ETI numerous problems with the machinery, and ETI attempted to address Topp's concerns. Ultimately, however, Topp was not

satisfied with ETI's resolution of its complaints, so it filed the pending lawsuit.[1]

Presently, the only remaining claim of Topp's Amended Complaint is Count IV — U.N. Convention — International Sale of Goods.[2] In this claim, Topp asserts that ETI "fundamentally breached the contract between the parties to such an extent that it has resulted in a detriment to [Topp] and [Topp] has been substantially deprived of that which it is entitled to expect under the contract." D.E. 28-1 at ¶ 30. Accordingly, Topp describes Count IV as "an action under the United Nations Convention on Contracts for the International Sale of Goods ["Convention"] (Part III) — Sale of Goods, Articles 25, 35, 50, and 51 of the [Convention]." *Id.* at ¶ 29. Count IV specifically seeks "to avoid the contract in its entirety due to a fundamental breach by [ETI]. [Topp] seeks a full refund in return for the equipment. Alternatively, [Topp] seeks judgment against [ETI] for the difference in the contract price and the value of the equipment in its defective condition at the time of delivery, together with all other and further relief as provided in the [Convention]." *Id.* at ¶ 33. In addition, Count IV expressly incorporates by reference all allegations contained in paragraphs 1 through 11 of the Amended Complaint. *Id.* at ¶ 28. Paragraph 11, in turn, avers that Topp has suffered damages "including but not limited to, the purchase price, lost sales, and lost profits." *Id.* at ¶ 11.

Through its Motion *in Limine*, ETI seeks to preclude Topp from introducing any evidence or making any argument concerning consequential damages that Topp allegedly incurred as a result of ETI's alleged breach of contract. *See* D.E. 65. In support of its Motion *in Limine*, ETI argues

---

[1]The facts regarding this case are more specifically set forth at this Court's Order on Defendant's Motion for Summary Judgment. *See* D.E. 80.

[2]Topp is a Florida company, and ETI is located in Quebec, Canada.

that (1) the contract between ETI and Topp expressly waives any claim that Topp otherwise may have had for consequential damages, and the Convention does not otherwise allow Topp to recover consequential damages; (2) during a deposition taken pursuant to Rule 30(b)(6), Fed. R. Civ. P., Topp conceded that it could not prove a claim for consequential damages without an expert, and it has no such expert; and (3) Topp untimely produced the documents upon which it seeks to rely in making its claim for consequential damages.  Topp opposes the Motion *In Limine*, contending that the contract — including its waiver of consequential damages — must be avoided because ETI fundamentally breached the contract, and the Convention allows for the recovery of consequential damages; (2) ETI has misconstrued the statements made by Topp's representative at the Rule 30(b)(6) deposition; and (3) Topp timely produced the records on which it seeks to rely to prove its claim of consequential damages.  The Court considers each argument in turn below.

## *II.  Discussion*

A.  Under the Convention, Where a Party Demonstrates a Fundamental Breach of Contract, That Party is Entitled to Seek Certain Forms of Consequential Damages

Beginning with the language of the contract, the contract contains a "WARRANTY OF Seller [sic]" provision that provides, in relevant part,

> Seller warrants the equipment manufactured and sold by it hereunder to be free from defects in material and workmanship under normal use and service for a period of 12 months from the date of equipment installation, provided that the equipment covered by this warranty is installed within 90 days from the date of shipment from Seller's factory.  During the warranty period, Seller agrees to repair or replace, at Seller's option, any defective part(s) covered by this warranty.
>
> ***
>
> Seller warrants the entire machine to be free of defects and workmanship.
> ***

<␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊␊

> This warranty is in lieu of all other warranties, expressed or implied, including any implied warranty of merchantability or fitness for a particular purpose.
>
> Buyer's exclusive remedy against Seller for any claimed defect or nonconformity in the equipment is limited to repair or replacement as set forth in this warranty. Seller neither assumes, nor authorizes anyone on its behalf to assume for it, any other obligation or liability. In no event shall the Seller be liable for indirect, consequential, special, or incidental damages of any nature whatsoever, including lost profits or loss of use [of] the equipment.

*See* D.E. 28-1 at 13, ¶ 6. Based on this provision, ETI argues that Topp has contracted away its right to seek consequential damages.

If the case began and ended with the contract, this Court would agree with ETI. But it does not. As the Court has already held, Topp has raised an issue of material fact concerning whether ETI's performance under the contract constitutes a fundamental breach of the contract. *See* D.E. 80. Therefore, if a jury agrees with Topp that ETI did fundamentally breach the contract, under the Convention, Topp has two options: it may either require delivery of substitute goods, *see* Convention art. 46; or it may avoid the contract, *see* Convention art. 49. And, indeed, Count IV of the Amended Complaint specifically "seeks to avoid the contract in its entirety due to a fundamental breach by the Defendant" and requests "judgment against the Defendant for the difference in the contract price and the value of the equipment in its defective condition at the time of delivery, together with ***all other and further relief as provided in the [Convention]***." D.E. 28-1 at ¶ 33 (emphasis added).

Thus, the issue becomes whether, under the Convention, avoidance of the contract renders null and void the contractual provision that eliminates Topp's right to obtain consequential damages. To answer this question, the Court looks to the language of the rest of the Convention. "In

construing a treaty, as in construing a statute, we first look to its terms to determine its meaning." *Alvarez-Machain I*, 504 U.S. 655, 663 (1992).  Similarly, other courts have noted, "Because there is virtually no caselaw under the Convention, we look to its language and to 'the general principles' upon which it is based" when construing its provisions.  *Delchi Carrier SpA v. Rotorex Corp.*, 71 F.3d 1024, 1027-28 (2d Cir. 1995) (citing Convention art. 7(2)).  Article 7 of the Convention explains, in interpreting the Convention, "regard is to be had to its international character and to the need to promote uniformity in its application and the observance of good faith in international trade."  Convention art. 7(1).  Obviously, uniformity in application is advanced when courts follow the language of the Convention if it is clear.

Here, the Court need not look beyond the language of the Convention because it does, in fact, answer the precise question at issue: a party may be awarded certain forms of consequential damages where the other party has fundamentally breached the contract and the first party seeks to avoid the contract as a result.  *See* Convention art. 61(1)(b), art. 74, art. 75, art. 76, art. 81.  First, as noted above, Article 49 of the Convention designates avoidance of the contract as a remedy for fundamental breach of the contract.  *See* Convention art. 49.

Second, Section V of the Convention sets forth the "[e]ffects of avoidance."  *See id*. at § V. Among other effects of avoidance, Article 81(1) of Section V explains, "Avoidance of the contract releases both parties from their obligations under it, subject to any damages which may be due. Avoidance does not affect any provision of the contract for the settlement of disputes or any other provision of the contract governing the rights and obligations of the parties consequent upon the avoidance of the contract."  Thus, the contractual provision precluding recovery of consequential damages continues in force only if it is a provision "for the settlement of disputes" or a provision

"governing the rights and obligations of the parties consequent upon the avoidance of the contract." Here, it is neither. Nothing about the "Warranty of Seller" provision addresses settlement of disputes, like a provision requiring arbitration or mediation might. Nor does the "Warranty of Seller" provision of the contract specify in any way that it is intended to limit or otherwise affect the parties' rights in the event that an avoidance of contract is declared. Consequently, the remainder of Article 81(1) applies, and, in the event of an avoidance, both parties are released from their obligations under the contract, subject to "any damages which may be due." Convention art. 81(1).

Section II of the Convention, in turn, titled "Damages," sets forth the Convention's rules regarding damages. *See* Convention § II. Article 76 of Section II of the Convention explains what happens when a "contract is avoided and there is a current price for the goods." *Id*. at art. 76(1). In particular, the party claiming damages may "recover the difference between the price fixed by the contract and the current price at the time of avoidance as well as any further damages recoverable under article 74. . . ." *Id.* Article 74 of Section II, in turn, states as follows:

> Damages for breach of contract by one party consist of a sum equal to the loss, ***including loss of profit***, suffered by the other party as a consequence of the breach. Such damages may not exceed the loss which the party in breach foresaw or ought to have foreseen at the time of the conclusion of the contract, in the light of the facts and matters of which he then knew or ought to have known, as a possible consequence of the breach of contract.

Convention art. 74 (emphasis added). Thus, the language of the Convention specifically contemplates the availability of consequential damages in the form of damages for loss of profit, even in the case of avoidance of a contract.

ETI suggests that the fact that Count IV of the Amended Complaint does not reference Articles 81(1), 76(1), or 74 of the Convention but instead invokes Part III — Sale of Goods, Articles

25, 35, 50, and 51 of the Convention renders off limits to Topp these portions of the Convention. But this Court is not free to simply ignore the existence of pertinent provisions of the Convention, inventing itself the meaning of other isolated parts of the Convention. Moreover, Sections II and V of the Convention, designated "Damages" and "Effects of avoidance," respectively, do not set forth causes of action under the Convention. Rather, the "Damages" section is more akin to a definitional section, and "Effects of avoidance" simply explains the what happens under the Convention when avoidance is awarded. Neither section sets forth a cause of action under the Convention, unlike, for example, Article 35 of the Convention, which imposes a requirement on the seller to "deliver goods which are of the quantity, quality and description required by the contract and which are contained or packaged in the manner required by the contract." Convention art. 35. Thus, the Convention plainly provides for the recovery of lost profits in the case of avoidance of a contract.

B.    Topp May Present Evidence of Lost Profits That Are Ascertainable Within a Reasonable Degree of Certainty

Next, ETI argues that Topp should not be permitted to present evidence of lost profits because it should be bound by its alleged answers during its Rule 30(b)(6), Fed. R. Civ. P., deposition that Topp required an expert to ascertain lost profits, and Topp has no expert. In this regard, ETI points first to the topics listed in the notice of Rule 30(b)(6) deposition served upon Topp:

> ***Topp's profits and losses from using the equipment*** it purchased ETI, including but not limited to:
>
> a.   the products Topp produced (or attempted to produce) with the equipment,
> b.   all expenses Topp has incurred or is incurring with respect to the equipment,

      c.    *all sales contracts, purchase orders, or other agreements Topp had with customers (or potential customers) regarding products made (or to be made) with the equipment Topp purchased from ETI*,

      d.    all revenue Topp has collected from products it made with the equipment, including the customers it collected that revenue from,

      e.    *all revenue Topp claims it could have collected, but did not collect, based on problems, defects, or malfunctions it claims exists with the equipment, including the customers it claims it would have collected that revenue from*, and

      f.    all efforts Topp undertook, or could have undertaken, to mitigate the losses it claims to have sustained from not collecting such revenue.

D.E. 65 at 4-5 (quoting D.E. 65-1 at 4) (emphasis in original deleted and emphasis added by Court).

Next, ETI notes that Topp's chief executive officer, Robert Rubin, testified on behalf of Topp at the Rule 30(b)(6) deposition on these topics. *See* D.E. 65 at 4-5. With regard to lost sales, Rubin testified as follows:

> Q:    Okay. Is there any way that — to quantify for me lost sales?
>
> A:    You know, I think there probably are in those specific customers, because those customers — let's call it the vitamin company. If the vitamin company does, you know, 20 million jars a year, you know, we could do that, but I actually think that this is more for an expert. An expert's got to figure out if this was working, you know, we got these customers, we got a few more — if we got, I mean, I think that's an expert — you know, requires an expert in the industry to figure that out. But clearly, with the three — Office Depot, you know, the three customers that we know, you know, that potential. And I even have a friend, an acquaintance that is involved with the University of Miami that's the largest tomato farmer in the United States, and we couldn't even go to him. I mean, so we never— I would . . . .

D.E. 65-2 at 3. Although the answer plainly continues, neither ETI nor Topp filed additional parts of the deposition transcript with the Court. ETI further directs the Court to the following answers

that Rubin provided during the Rule 30(b)(6) deposition:

> Q: Okay. Can you give me a little details behind how you weren't able to fulfill Office Depot's orders?
>
> A: Well, it's more of an operational question, and I can — I think it's a good question to ask Israel, all the issues he had to deal with Office Depot because he dealt with those guys on a regular basis. I just know from a business standpoint what happened. And I was in on the initial meeting with Office Depot, talking about their plans, and — but the actual implementation and execution of the orders, Israel was involved with.
>
> Q: Are you able to quantify for me what the damages are with respect to the Office Depot?
>
> A: Again, I think that's — you know, we can quantify with respect to the customer that they brought us, or two, or whatever, but, you know, the whole relationship, without bringing an expert in here, I don't think we can do that. It's beyond what I think I can do.
>
> Q: Okay. Please give me a little specifics as to why you weren't able to fulfill the orders that were being placed from Ecuador to accommodate Dole.
>
> A: I mean, the same — the release issue. The same issue. The paper. In Ecuador, they do — actually, they hand, you know — I'm laughing about it, but they do hand stickers. So the women — I shouldn't say women, men or women, whoever would be doing it, would have like five or ten stickers on their hand, and they would do (indicating) doing thousand [sic] of bananas. And the stickers wouldn't come off, basically, on their hands, and they couldn't do it. They rejected it. It slowed up their process. They rejected it. That's when we first identified the issue was that.

*Id.* at 4-5. Based on this testimony, ETI contends that if Topp wishes to offer evidence regarding consequential damages, it must do so through expert testimony, which it does not have.

Topp retorts that, although Rubin opined that an expert could more readily determine lost

profits, Rubin and Israel Perez, who also testified in a Rule 30(b)(6) deposition on behalf of Topp, explained how lost profits could be ascertained without an expert:

> A: The fruit labels also get applied with applicators at very fast speeds. The JBT project that we were talking about, JBT makes their own machines, and they generate their own labels; they print their own labels. They buy materials from other suppliers, which that's why they wanted to — actually, JBT wanted to buy a machine from ETI, and that's how it got passed to us, because they didn't have the volume necessary to justify the cost of the machine. Those labels get applied like 13 labels per second, so they need [to] make sure that the release is proper, otherwise they're going to get stuck.
>
> Q: So the categories that you were selling for the high volume were the ones for the food and the produce and for the packaging?
>
> A: Correct.
>
> Q: And the issue, the specific issue had to do with the release of the labels and their ability to come off quickly and stick?
>
> A: The initial release to break the — disengage between the liner. That's the major, major, major issue on that.
>
> Q: Okay. So what customers did Topp try to sell labels to that it was unsuccessful either because they were returned or because they were never purchased because of this issue?
>
> A: Well, the first customer was in Ecuador, Sismode. We were producing material for them, and part of the equation was to provide material for the bananas in Ecuador. We made several type [sic] of samples. They made several type [sic] of labels so they can get the product approved by them, and we never got them approved. So that was our first customer. . . . [The labels] were never approved . . . [b]ecause of the release.
>
> * * *
>
> Q: What else did Topp do to try to address this release issue when it tried to sell the labels to Sismode?

A: ... We started approaching the local markets to sell to the local guys the product. Then we started selling to all those companies that I told you before for, for labels, Eti Labels, and again, the whole story repeated again. We start having complaints, issues. They started having rejections on the labels. You know, they were saying, if I use your material, you know, I can't use it because the applicator would not work properly, so I have to use somebody else's material, da, da, da. It got to the point that little by little, they start fading our product from their shelves. You know, they wouldn't buy from us.

\* \* \*

Q: ... What other customers did ... Topp try to sell labels to that it was not successful in selling to?

A: Well, we sold label [sic] to another company; it's called Advanced Labels in Miami. We sold a batch of labels for the orange growers and also it failed. We sold labels to —

Q: Why did that fail?

A: Because of the applicator, the labels were getting stuck in the applicator.

\* \* \*

Q: ... What other customers did Topp try to sell to that it couldn't?

A: The JBT was one of the major accounts that —

Q: Tell me what happen [sic] with JBT.

A: JBT was a project that was recommended by Frederic to us because JBT — it's a big company. It's a manufacturer of applicators and juice extractors. Probably one of the largest companies in the United States. So they had in mind to produce their own materials, since not they're buying it from a source that produces the material. They have a special material they use for their labels. So Frederic introduced us to them and gave us a — like a — like guidelines of the pricing and stuff like that. And at that point, the guidelines

-11-

          that he gave us, you know, I checked some of the stuff, it was a little bit off, but we were still — JBT was able to sign an agreement with us, you know, with the price that we had provided them. And part of the deal is that, you know, with the price that we had provided them. And part of the deal is that, you know, we needed to do some testing, which they pay for it. And if the testing was successful, we would start making the material for them. . . . We run the test two different adhesive, direct food contact adhesive. We provided them with the samples, and they tested the samples. The first — the first sample, one of the adhesive failed at 30 days because of the release. And the other sample failed after a couple of months because of the release. . . .

\* \* \*

Q: . . . What other customers did ETI try to sell to that it was unable to?

\* \* \*

A: Oh, Office Depot. We started a new project with them selling them labels for their, you know, packaging. . . . And we run across Vitamin Shop, one of their Office Depot customers. We sent them the labels and the whole batch was rejected again because of — I tried to make labels with a different formation with the lower release, sent it to them, and it still failed. Again, we failed that application, too.

\* \* \*

Q: Any other customers that . . . Topp tried to sell to that it was unable to sell to?

A: I mentioned to you Advance, Eti Label, the company.

\* \* \*

Q: . . . All of the customers that Topp tried to sell labels to and that were either unsuccessful in selling the labels or the customer rejected the labels after they were purchased was because of the release issue?

A: Yes.

D.E. 82-1.

Review of these transcript excerpts reveals that, although Rubin certainly did suggest that an expert would be better equipped to determine Topp's lost profits, both Rubin and Israel also pointed to readily ascertainable lost sales that Topp asserts are a direct result of ETI's alleged fundamental breach of the contract.

Under Florida law, "lost profits 'must be proven with a reasonable degree of certainty before [the loss] is recoverable.'" *Paul Gottlieb & Co., Inc. v. Alps S. Corp.*, 985 So. 2d 1, 9 (Fla. 2d DCA 2007) (citation omitted). Courts have construed this standard as requiring that "[t]he mind of a prudent impartial person . . . be satisfied that the damages are not the result of speculation or conjecture." *Id.* (citation and internal quotation marks omitted). In unproven businesses such as Topp's, Florida courts have allowed damages where the plaintiff proves that (1) the defendant's action caused the damage and (2) there is some standard by which the amount of damages may be adequately determined." *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two Ltd.*, 545 So. 2d 1348, 1350-51 (Fla. 1989) (citation omitted).

Here, both standards may be satisfied without resort to expert testimony. Rubin and Perez's testimony attributes Topp's loss of customers such as Office Depot, JBT, Eti Labels, and Sismode exclusively to Topp's inability to deliver labels that released or stuck appropriately, a circumstance for which Rubin and Perez both blame ETI. According to Rubin and Perez, Topp could not produce the desired labels solely because ETI fundamentally breached its contract with Topp by providing Topp with non-functional machines that were not capable of creating quality labels. If a jury credits this and related evidence, Topp will have satisfied the first standard for obtaining damages.

As to the second standard — a measure by which the amount of damages may be adequately

determined — Rubin and, in particular, Perez's testimony, in conjunction with documentary evidence of canceled contracts, invoices, or orders, would allow Topp to satisfy that requirement. This is not a situation where the damages would be speculative since Topp actually had clients who had placed orders for labels with Topp. Thus, to the extent that Topp seeks to establish its lost profits by relying on this type of evidence, Topp satisfies the requirement that its lost profits be ascertainable within a reasonable degree of certainty.

On the other hand, Topp's proposal to calculate lost-profit damages by "comparing the difference between Topp's projected income, as set forth in its 2009 through 2011 income projections, and its actual income," D.E. 82 at 10, does not provide an adequate basis to assess lost profits with a reasonable degree of certainty. While Topp asserts that its projections were based upon discussions with ETI, *id*. at 11, review of the deposition transcript on which Topp relies for this proposition reveals that the discussions to which the deponent referred concerned "how much the Cohesio could be used in a 24-hour period," D.E. 82-2 at 6; they were not about obtaining and keeping customers. And Topp's projections are not based on Topp's existing business record because the labeling business was a new one for Topp.

Nor does Topp offer evidence to allow comparison of Topp's business with other businesses that have been in existence for some time and are "closely comparable."[3] *See River Bridge Corp. v. Am. Somax Ventures*, 18 So. 3d 648, 650 (Fla. 4th DCA 2009) (quoting *4 Corners Ins., Inc. v. Sun Publ'ns of Fla., Inc.*, 5 So. 3d 780, 783 (Fla. 2d DCA 2009) (citing *G.M. Brod & Co. v. U.S. Home Corp.*, 759 F.2d 1526, 1538 (11th Cir. 1985))) (internal quotation marks omitted). Under these

---

[3] Such a comparison is called the "yardstick test." *See River Bridge Corp.*, 18 So. 3d at 650.

circumstances, Topp may not rely on its 2009 through 2011 projected-income statements to establish lost profits.

C.     The Documents Will Not Be Excluded Under Rule 37(c)

Finally, ETI argues that Topp should not be permitted to present evidence of lost profits because Topp failed to comply with its discovery obligations. In this regard, ETI notes that, in its November 15, 2012, responses to ETI's Interrogatories and Requests for Production, Topp stated that it would produce documents supporting its consequential damage claims. *See* D.E. 65 at 7-8 (citing D.E. 65-3). When ETI did not receive the documents that it wanted, ETI contacted Topp and requested documents relating to Topp's allegations of lost profits. *Id.* at 8.

Topp responded on January 11, 2013, stating that Topp was "fine with producing [Topp's] ledger to [ETI] and following that up with any documents on which [Topp] intend[s] to rely to support [its] damages claim once [Topp] know[s] what those documents are." D.E. 65-5. On February 1, 2013, the last day of the discovery period, Topp produced a copy of its general ledger to ETI, but it did not produce any additional backup documentation. D.E. 65 at 8.

Three weeks later, on February 22, 2013, ETI contacted Topp and requested the backup documents. *See* D.E. 65-6. At the end of ETI's email to Topp, ETI cautioned, "If Topp does not produce the requested documents . . . by February 28, 2013, ETI will seek appropriate relief from the court." *Id.* Between February 22 and 28, counsel for the parties conferred regarding ETI's requested document production. *See* D.E. 65-7. In two separate emails dated February 26, 2013, counsel for ETI again warned Topp, "[I]f Topp does not produce such documents by February 28, 2013, [ETI] will seek appropriate relief from the Court" and "If these requests are not met, [ETI] will seek appropriate relief from the Court." *Id.* at 2-3.

Topp responded the following day, stating that it was "working diligently to gather and produce [the requested documents]" and that it "believe[d] that it [could] produce [the documents] on or before March 15." *Id.* at 1 (emphasis omitted). ETI once again responded, "[I]t is our position, as we stated in previous e-mails, that we want the back up documentation by February 28, 2013 . . . ." *Id.*

February 28, 2013, came and went, and ETI did not seek relief from the Court. On March 18, 2013, Topp produced the remaining documents to ETI. D.E. 65 at 8-9.

A month later and two-and-one-half months after the discovery period ended, on April 19, 2013, ETI, for the first time, raised the issue of the allegedly late production with the Court in ETI's Motion *in Limine*. *See* D.E. 65. Through this Motion, ETI urges the Court to preclude Topp from relying on the documents produced on March 18, 2013, because the documents were not produced until March 18, 2013. In support of its Motion, ETI relies on Rule 37(c), Fed. R. Civ. P.

Rule 37(c) provides, in relevant part,

> **(1)** ***Failure to Disclose or Supplement.*** If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on . . . at a trial, unless the failure was substantially justified or is harmless. . . .

Fed. R. Civ. P. 37(c). A failure to comply with Rule 26(a) or (e) is "harmless" under Rule 37(c) when "there is no prejudice to the opposing party." *In re Denture Cream Prods. Liab. Litig.*, 2012 WL 5199597, *5 (S.D. Fla. Oct. 22, 2012) (citation and internal quotation marks omitted).

Here, as ETI's own actions demonstrate, Topp's failure to provide the requested backup documentation until March 18, 2013, was harmless. First, before the discovery deadline, Topp provided ETI with, among other documentation, its projected profit-and-loss statements for 2009

-16-

through 2011; its tax returns; its sales and use tax returns; its balance sheets; its income statements for 2009 through 2000, and its general ledger for all accounts and subsidiary ledgers for 2009 through 2011. This production consisted of approximately 1,000 pages and, according to Topp, represented every transaction recorded by Topp since its formation. D.E. 82 at 12. Only the backup documentation for these records was not produced. As a result, this is not a situation where ETI was sandbagged, as it now claims.

Second, and significantly, although ETI repeatedly threatened to seek assistance from the Court in obtaining the backup documentation, it never actually did so. Instead, it implicitly acquiesced in Topp's March 18, 2013, production. These facts suggest that ETI itself did not feel prejudiced by the late production.

Third, ETI has now had the documents at issue for more than six months, so it is not, by any objective measure, in any way prejudiced by the March 18, 2013, production. As a result of all of these facts, Topp has demonstrated that no prejudice resulting from Topp's late production of the backup materials occurred, and exclusion of the evidence from trial is not appropriate.

### *III.  Conclusion*

For the foregoing reasons, Defendant ETI Converting Equipment's Motion *in Limine* Regarding Plaintiff's Consequential Damages Claim [D.E. 65] is **GRANTED IN PART and DENIED IN PART**, consistent with the terms of this Order. Topp may not rely on its 2009 through

2011 projections to prove damages.  In all other regards, the Motion *in Limine* is denied.

**DONE AND ORDERED** at Fort Lauderdale, Florida this 28th day of September 2013.

                                                                            ／s/ Robin S. Rosenbaum
                                                                            ROBIN S. ROSENBAUM
                                                                            UNITED STATES DISTRICT JUDGE

copies:          Counsel of Record